William SCOTT, Plaintiff-Appellee,

v.

ANCHOR MOTOR FREIGHT, INC., Defendant-Appellant.

William SCOTT, Plaintiff-Appellant,

v.

ANCHOR MOTOR FREIGHT, INC., et al., Defendants-Appellees.

William SCOTT, Plaintiff-Appellee,

v.

TEAMSTERS LOCAL UNION 377, Defendant-Appellant.

Nos. 73–1703–73–1705.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 11, 1973.

Decided April 30, 1974.

Paul H. Tobias, Cincinnati, Ohio, on brief for plaintiff-appellant; Goldman, Cole & Putnick, Cincinnati, Ohio, Niki Z. Schwartz, Cleveland, Ohio, Thomas P. Wellman, Youngstown, Ohio, of counsel.

Bernard S. Goldfarb, Cleveland, Ohio, on brief for Anchor Motor Freight, Inc.; Goldfarb & Reznick, Cleveland, Ohio, of counsel.

Eugene Green, Green, Schiavoni, Murphy & Haines, Youngstown, Ohio, for Teamsters Local Union No. 377.

Before CELEBREZZE, PECK and McCREE, Circuit Judges.

CELEBREZZE, Circuit Judge.

Consolidated herein are three appeals from a judgment against a company and a union. Plaintiff William Scott (Scott) sued his former employer and union representative under section 301 of the Labor Management Relations Act,[1] claiming that Defendant Anchor Motor Freight (Anchor) had wrongfully discharged him and that Defendant Teamsters Local 377 (Local 377) had unfairly represented him in protesting the discharge.

Through special verdicts, the jury found that Scott had been wrongfully discharged and assessed damages against Anchor of $12,500. It also

1. 29 U.S.C. § 185.

awarded Scott $12,500 from Local 377, which it found had failed to represent him properly.

Local 377 appeals the final judgment, as well as the District Court's denials of motions for judgment notwithstanding the verdict and for vacation of the judgment. Anchor appeals on identical grounds, as well as appealing a denial of a motion for a new trial. Plaintiff Scott also appeals, claiming that the District Court's denial of a post-trial motion for an award of attorney fees was erroneous.

Scott began driving trucks for Anchor in 1953. In 1964 Anchor shut down its Norwood, Ohio terminal, where Scott had been working. A new terminal was opened in Lordstown, Ohio in 1966, and Anchor offered Scott a job after a physical examination by a company doctor, who certified Scott under ICC rules though noting that he was a diabetic. Over two months later, Scott was discharged, on July 23, 1966. Anchor claims the discharge resulted from Scott's physical problems while on the job in 1966 and a second letter from its doctor, stating that Scott was unfit to drive a truck. It argues that Scott was unfit under ICC rules, so that it was merely obeying the ICC when it discharged Scott. Scott claims he was fired because of his initiation of legitimate complaints against the Company. Scott introduced evidence that the company doctor had been pressured into changing his opinion as to Scott's fitness, that Anchor officials acted out of personal hostility in discharging him, and that he suffered no blackouts or other uncontrollable problems from his diabetes, which was being treated by mild medication.

Soon after his discharge Scott sent two letters to Teamsters Local 377, complaining of pay shortages for completed work and of an unfair discharge. He did not file a standard grievance form, according to Local 377, nor did he appeal his discharge in writing to the Company within ten days of his discharge. Local 377 did not press Anchor about the discharge, and Scott introduced evidence that the Union handled his protest perfunctorily and in bad faith. In December 1966 or January 1967, Scott attempted to have Local 377's steward and committeeman process a grievance concerning this discharge. There was evidence that because of the newness of the Lordstown operation, Local 377 did not have the requisite machinery to process a grievance within ten days of Scott's discharge, a time limit imposed by the labor contract for appealing discharges thought to be unfair.

Receiving no relief from the Company and no significant help from the Union, Scott filed a complaint in District Court in April 1968, alleging an improper discharge and unfair representation by Local 377. The jury verdict followed.

■ The first issue we face is whether Defendants were entitled to judgment notwithstanding the verdict on the ground that Scott failed to invoke the grievance procedures set forth in the Local 377—Anchor contract. If Scott's efforts to invoke the contract grievance procedures were insufficient as a matter of law, he is barred from suing his employer and union. Republic Steel Corp. v. Maddox, 379 U.S. 650, 653, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); Durham v. Mason and Dixon Lines, Inc., 404 F.2d 864, 865 (6th Cir. 1968).

The District Court let the jury determine whether Scott had complied with the terms of the collective bargaining agreement. It instructed the jury:

"The second question you will be asked to answer either yes or no, which, in either instance, has to be the unanimous opinion of you all, is:

'Has the plaintiff properly filed or caused to be filed in his behalf a notice of appeal from discharge in writing within the time limitation, if any, set forth in the contract?'

In conjunction with that, you will be required to answer Question 2-A, which reads:

'If the answer to Question No. 2 is in the negative, has the plaintiff been excused from compliance with any re-

quired notice by the conduct of the union?'

The plaintiff must comply with all conditions precedent or requirements on his part of things to be performed by him under the contract before he can recover.

The contract provides in part: 'Appeal from discharge, suspension or warning notice must be taken within ten days by a written notice.'

The defendants contend that the contract provides that a, copy of an appeal must be filed by the plaintiff with the company and the plaintiff has failed to comply with certain provisions of the contract.

The plaintiff states that the contract does not require that plaintiff file a copy of an appeal with the company and that the contract requires a filing with the union, and further, if the contract does require a filing with the company, that the plaintiff is excused from filing said appeal or grievance with the company as a result of the conduct of the union.

I state to you that it is for you to determine whether or not the contract requires that a copy of an appeal or grievance should be filed by the plaintiff with the company and, if you determine that the contract does require the filing by the plaintiff with the company, whether or not the plaintiff's compliance with that provision is excused or waived by reason of the alleged conduct of the union.

I state to you that if the conduct of the union wilfully prevented compliance with the contract requirement that a copy of the appeal be filed with the company, such requirement can be waived.

Likewise, the defendants contend that the contract requires that any notice of appeal or protest or grievance shall be filed within ten days of the date of discharge and the plaintiff has failed to comply with said provision of the contract and, therefore, cannot recover.

It is for your determination as to the meaning of the contract and the time when the ten-day limitation starts to run and for you to determine the plaintiff's compliance or noncompliance within the meaning of the provision of the contract, as you determine the meaning of said provision."

■ It is clear from Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), that an "employee must at least attempt to exhaust grievance and arbitration procedures established by the [collective] bargaining agreement," 386 U.S. at 184, before a court may entertain a claim of unfair representation against a union and wrongful discharge against an employer. "[U]nless the contract provides otherwise, there can be no doubt that the employee must afford the union the opportunity to act on his behalf." Republic Steel Corp. v. Maddox, 379 U.S. 650, 653, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965). Whether a plaintiff has done this is a question of federal law, subject to proof at trial. The evidence in this case sufficed to support a finding that Scott made a good-faith effort to invoke' the contract's grievance procedure.

■ On August 2, 1966, Scott sent a letter to Local 377, which stated that "I feel that I am a safe driver and should be reinstated with back pay" and requested a meeting and hearing as soon as a steward and representative committee for the Lordstown plant could be elected, none having been set up since the Lordstown operation's opening. Assuming that this letter was timely sent and properly addressed, it was a sufficient attempt to invoke the collective bargaining agreement's grievance procedure, under Republic Steel Corp. v. Maddox and Vaca v. Sipes, to give the District Court jurisdiction over the case. Contrast Steen v. Local 163, 373 F.2d 519 (6th Cir. 1967), where "plaintiff had made no effort whatsoever to comply with the grievance procedure," 373 F.2d at 520; and Broniman v. Great Atlantic & Pacific Tea Co., 353 F.2d 559 (6th Cir. 1965), where "there was no

real attempt to use the grievance procedure," 353 F.2d at 563.

Given this conclusion, whether Scott actually wrote this letter and whether he complied with the terms of the contract in delivering it are questions of fact, subject to a jury's determination.

■■■ When a contract is ambiguous, it is for the jury to determine the meaning of its terms, subject to proper instructions and based upon "evidence of the surrounding circumstances and the practical construction of the parties." Tennessee Consolidated Coal Co. v. United Mine Workers of America, 416 F.2d 1192, 1198 (6th Cir. 1969); [2] Goddard v. Foster, 17 Wall. 123, 142, 84 U.S. 123, 21 L.Ed. 589 (U.S. 1872); Local 783 v. General Electric Co., 471 F.2d 751, 757 (6th Cir. 1973). Article 32 stated that appeals from discharge "must be taken within ten days by a written notice." The contract is ambiguous as to when the ten-day limit begins to run and whether notice must be sent by the discharged employee to the employer (rather than solely to the union). The District Court properly allowed the jury to resolve these ambiguities, and the jury resolved them in favor of Scott.[3]

Thus, the District Court's instruction to the jury on Questions 2 and 2–A is not reversible error, though it might have been more clearly stated and have better explained the legal principles that bound the jury's quest for truth. Likewise, the jury's conclusion is not reversible.

The second issue before us is whether Defendant Anchor was entitled to judgment notwithstanding the verdict or a new trial on the ground that, as a matter of law, Scott's discharge cannot be deemed wrongful.

Anchor sought instructions from the District Court that would essentially have stated that if the jury found that the Company's doctor in good faith refused to certify Scott as a fit driver under ICC rules, then it should find for Defendant Anchor. The District Court refused to give such a charge. Instead, it stated the following:

"The first question you will have to answer is:

'Do you find that the plaintiff has established by a preponderance of the evidence that Anchor Motor breached its contract with Local Union 377 by discharging Mr. William Scott in July, 1966'?

Under the contract, which you will have with you in the jury room, the company had full power to discharge. It was agreed that this power to discharge shall be exercised with justice with respect to the reasonable rights of both the employee and the employer. The contract also requires that judgment be exercised with just cause.

You should take into account the reasonable rights of both the plaintiff and the company and all the facts you find to be pertinent to a determination of whether this discharge was with justice and for just cause.

You may also take into consideration what, if anything, the company records show as to the nature of the plaintiff's physical condition and the duties required of the plaintiff.

You may take into consideration the company's performance relative to other employees with disabilities.

---

2. When a contract is unambiguous, the judge must state its proper construction to the jury rather than allow it to adopt an erroneous view of the contract. See 4 S. Williston, Law of Contracts 303 (3d ed. 1961). "Where, however, the meaning of a writing is uncertain or ambiguous, the question of its meaning should be left to the jury." 4 Williston, 652. Cf. 3 A. Corbin, Contracts 226–27 (1960).

3. Article 32 provides that "Discharge must be by proper written notice to the employee and the union affected," so that the date of discharge could be construed to be the date on which the employee and the union had both received notice of the discharge. Here that date was July 26. Since Local 377 received word of Scott's request for help no later than August 4, Local 377 would have had time to press his claim within the ten-day limitation, under this reading of the contract.

You may also take into consideration whether or not a warning was served upon the plaintiff and the effect of the service or lack of service on the plaintiff and the effect of the same on the respective rights of the parties.

I have used the term 'justice.' Justice means to act with equity, in fairness.

I have used the term 'just cause.' Just cause means a cause based upon reasonable ground and a fair and honest cause or reason regulated by good faith on the part of the party exercising the power to terminate."

■ This charge allowed the jury to determine the meaning of "just cause" under the contract. The meaning of this phrase was hotly disputed by the parties. Anchor argued that a good-faith refusal of its doctor to certify a driver should amount to just cause, as a matter of law, even if the jury were to conclude that the doctor had made a mistake and that Scott qualified under ICC rules. Scott argued the opposite, claiming that it is unjust to discharge an employee when the asserted reason is based on an error of a company's agent.

Under Tennessee Consolidated Coal Co. v. United Mine Workers of America, 416 F.2d 1192, 1198 (6th Cir. 1969), ambiguous terms of a contract are to be construed by the jury, not by the judge. This rule makes sense particularly in the present context. "Just cause" was deliberately inserted into the collective bargaining agreement to give an arbitrator, the final forum envisioned under the contract, significant flexibility in adjusting the rights of employer and employee. When the arbitrator's function is assumed by a court, because the grievance machinery has not functioned and an aggrieved employee asserts his right to a court test of his claim under Vaca v. Sipes, the job of interpreting "just cause" should be given to the jury.

Based on evidence of company practice, treatment of similar employees, and other relevant factors, the jury should be free to exercise its judgment in determining whether the plaintiff employee's discharge was "for just cause." We consider the District Court's description of that phrase proper and find no error in its charge to the jury on Question 1.

■ Finding the District Court's instructions on apportionment of damages proper,[4] the jury's determination of the amount assessed against Anchor not unreasonable, and no other contentions of Defendants-Appellants meritorious, we turn to Plaintiff Scott's appeal. Scott argues that the District Court abused its discretion in denying his post-trial motion for attorney fees.

In April 1972, the District Court allowed Scott to amend his complaint by approving the following request:

"Plaintiff further prays that after the trial of this action, the court award plaintiff reasonable attorney fees."

Scott claims that in reliance on the Court's action he did not present evidence at the August 1972 trial concerning attorney fees. After trial the District Court overruled a motion for attorney fees, stating that the jury verdict of $12,500 against Local 377 "must necessarily represent the jury's finding as to the extent that said defendant's conduct in refusing to handle plaintiff's grievance added to the difficulty and expense of collecting from defendant Anchor Motor Freight." The Court stated that the $12,500 verdict against Anchor necessarily represented the full extent of damages caused by its breach of contract (i. e., lost wages).

■ We agree with the District Court that an award of attorney fees against the employer in this case would be unjust, since the only damages for which an employer may be held are those directly caused by the wrongful discharge—that is, lost wages and relat-

---

4. The District Court's instructions on the amount of damages attributable to the union's unfair representation were taken directly from Vaca v. Sipes, *supra*, and Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L. Ed.2d 21 (1970).

ed items. Vaca v. Sipes, 386 U.S. at 197–198; Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970).

■ As to Defendant Local 377, however, the District Court's conclusion must be reversed. The Court itself granted Plaintiff Scott's motion to amend his complaint, thereby advising Scott that it would consider a motion for attorney fees *after* trial. By overruling Scott's motion for an award of attorney fees (claimed to be in excess of $12,500) after trial on the ground that the jury must have included attorney fees in its estimation of damages, the Court foreclosed Scott from proving the amount of litigation costs incurred because of the Union's breach of its duty of fair representation. Yet, the District Court charged the jury to award damages against the Union in an amount representing "the extent [to which Local 377's] refusal to handle the grievance added to the difficulty and expense of collecting from the employer." A reasonable juror would have assumed that this amount should include attorney fees.

The difficulty is that the jurors were presented with no evidence of what attorney fees were in this case, though their charge comprehended determining an amount of attorney fees. Thus, through no fault of Scott's, there was a complete absence of evidence concerning attorney fees, though they represented a major element of the damage incurred by Scott as a result of the breach of the Union's duty of fair representation. The $12,500 verdict against the Union necessarily rests on a sheerly speculative foundation and cannot stand. *See* Lavender v. Kurn, 327 U.S. 645, 653, 66 S. Ct. 740, 90 L.Ed. 916 (1946).

Because the error did not lie with Scott, we must afford him an opportunity to prove a proper amount of damages against the Union. We therefore vacate the award against Local 377 and remand to the District Court for a comprehensive determination of damages incurred by Scott as a result of the Union's breach of its duty of fair representation,

under the principles of Vaca v. Sipes, 386 U.S. at 196–98.

The judgments against Appellants Anchor Motor Freight and Local 377 in cases Nos. 73–1703 and 73–1705 are affirmed, with order that the damage award against Local 377 be vacated. Costs of these appeals are to be taxed equally between Anchor Motor Freight and Local 377. The order in case No. 73–1704 is reversed, and the cause is remanded to the District Court with instruction that the amount of damages properly attributable to the breach of Local 377's duty of fair representation be assessed. Costs of this appeal are to be taxed to Local 377.

McCREE, Circuit Judge (dissenting).

I respectfully dissent. The unambiguous terms of the collective bargaining agreement that governed appellee's employment required him to give notice of his grievance to his employer within ten days of discharge, and failure to comply with this requirement defeats the action in this case. Article 32 of the agreement provides: "Appeal from discharge . . . must be taken within ten (10) days by written notice. . . . If the employee involved is not within the home terminal area when the action of discharge . . . is taken, the ten (10) day period will start from the date of his return to the home terminal." Article 7 of the agreement, concerning grievance procedures, provides, in relevant part, "Disputes and grievances shall be *put in writing and presented to the company* within one (1) week whenever possible, but in no case later than thirty (30) days after the *grievance arises*." (emphasis added).

If these two provisions are considered together, it is apparent that wrongful discharge is a particular type of grievance about which the employee must complain within ten days, a shorter period of time than that allowed for presenting other grievances that may be less costly for the employer to remedy if the complaint proves to be meritorious. Yet, as Article 7 makes clear, all griev-

ances must be put in writing and presented to the employer within a specified period of time after they arise. In the case of a discharge, the grievance arises at the moment the employee is discharged, not at the time written notice of discharge is received by both the employee and his union. Moreover, Article 32 refers to discharge and not to receipt of notice of discharge as the event that starts the ten day appeal period running. This interpretation is also supported by the special provision for an employee who is away from home at the time he is discharged. Although he and his union may receive notice of discharge and the employee may be actually discharged while he is on the road, the ten day appeal period does not begin to run until he is home and presumably able to press his appeal conveniently.

This interpretation of the contract, I believe, is the only one that can be made considering the instrument as a whole, and it follows that the running of appellee's ten day appeal period commenced on July 23, the date of his discharge. It was not until the tenth day thereafter, on August 2, that appellee sent written notice of his grievance to his union. The union received this letter two days later. Appellee never notified his employer of his grievance within either the ten day period of time provided by the contract or within any reasonable period of time thereafter. Because of his failure to notify his employer of his grievance within the ten day period or even to request his union to act on his behalf at a time when it was still possible for the union to do so, he is precluded from recovering against either his employer or his union. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), Durham v. Mason and Dixon Lines, Inc., 404 F.2d 864 (6th Cir. 1968).

I believe that ambiguity can be found in the agreement only by a strained reading. However, even if the instrument were ambiguous and a jury might be permitted to determine the meaning intended by the parties to be placed upon unclear terms, reversal would still be required because the district court failed to give correct and sufficiently specific instructions to the jury about the legal rights and duties created by the instrument it was asked to construe. Although I agree that the meaning of ambiguous contractual provisions may present a question of fact to be resolved by a jury in appropriate cases, a jury, after factual ambiguity has been resolved, does not have the power to determine the legal effect to be accorded the provisions of the contract. It is a matter of elementary contract law that "[t]he determination of the legal operation of a contract, after the meaning of its language has been adopted by process of interpretation, is always for the court, because 'legal operation' is the result of applying rules of law to the facts. . . . [C]onstruction is always a matter of law for the court." 3 A. Corbin, Contracts §§ 534, 554 (1960).

Nor do I believe that under the circumstances of this case, the union could waive the employer's contractual right to receive notice of an employee grievance. The employer bargained for this right, and although it might waive it, the union, the opposite contracting party, could not. The district court erred when it instructed the jury that the union could waive notice for the employer, and the majority opinion, by not discussing the issue, approves this error by silence. Certainly the Supreme Court's decision in Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), does not authorize this instruction. The only question in that case was whether an employee who charged his union with breaching its duty of fair representation, a matter cognizable by the NLRB as an unfair labor practice, was precluded by the preemption doctrine from pursuing directly his grievance in a judicial forum. Nothing the Supreme Court said in that opinion supports the waiver instruction given by the district court because the conduct of the union in this case did not preclude or prevent

appellee *from giving notice of his grievance* to his employer. It may be appropriate to hold that an employer may not assert improper union conduct as a shield against an action brought by an employee when "the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and* if . . . the employee-plaintiff has been prevented from exhausting its contractual remedies by the union's *wrongful* refusal to process ·the grievance." Vaca v. Sipes, *supra*, at 185. This is not such a case.

I agree with the court's determination that the damage award cannot stand. Nevertheless, I would reverse because I believe that the bargaining agreement can be interpreted in only one way and that appellee failed to comply with its requirements for presenting his grievance. At a minimum, appellants are entitled to a new trial because the district court failed to give proper instructions to the jury on the issue of liability.