**GALGAY, Frank J. and Bonner, Francis P., Trustees of the Anthracite Health and Welfare Fund, and The Anthracite Health and Welfare Fund, Appellants,**

v.

## GIL–PRE CORPORATION.

**GALGAY, Frank J. and Bonner, Francis P., Trustees of the Anthracite Health and Welfare Fund and The Anthracite Health and Welfare Fund, Appellants,**

v.

## GILBERTON ENERGY CORPORATION.

Nos. 88–5200, 88–5201.

United States Court of Appeals, Third Circuit.

Argued Aug. 16, 1988.
Decided Dec. 23, 1988.

A. Richard Caputo (argued), Cynthia A. Smith, Shea, Shea & Caputo, Wilkes–Barre, Pa., for appellants.

Howard A. Rosenthal (argued), Gary D. Fry, Pelino & Lentz, P.C., Philadelphia, Pa., for appellees.

Before STAPLETON and MANSMANN, Circuit Judges, and FISHER, District Judge.[*]

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

These consolidated appeals concern the pension-fund provisions of a collective bargaining agreement between the United Mine Workers of America (UMWA) and the Anthracite Coal Operators. Appellants, Frank J. Galgay and Francis P. Bonner, are trustees of the pension fund, created for workers in the anthracite coal industry. Appellees, Gil–Pre Corp. and Gilberton Energy Corp., are signatories to the collective-bargaining agreement that created the pension fund. The agreement provides that royalties must be paid on anthracite coal "produced for use or for sale." The appellees' liability for royalties on their products depends on what that language means.

The district court had jurisdiction under section 301 of the Labor Management Relations Act of 1947 (Taft–Hartley Act), 61 Stat. 156, 29 U.S.C. § 185 (1982). In granting the summary-judgment motion of Gil–

Pre and Gilberton, the court acknowledged that where there exist competing, reasonable interpretations of a contract, the choice is for the trier of fact; in such cases, summary judgment is therefore inappropriate. The court found, however, that only one reasonable interpretation of the disputed language was possible: For coal to be "produced for use or for sale," it must be processed by a signatory through a coal breaker, also known as a preparation plant. Since neither Gil–Pre nor Gilberton Energy processed coal through a breaker during the relevant period, the court granted the appellees' summary-judgment motion. *Galgay v. Gil–Pre*, No. 86–1363, *Galgay v. Gilberton Energy Corp.*, No. 86–1364 (M.D.Pa. Sept. 30, 1987) (memorandum and order).

We have appellate jurisdiction under 28 U.S.C. § 1291. Our review of the district court's application of Rule 56 is plenary. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976). We must decide whether, viewing the Rule 56 materials in the light most favorable to appellants, a reasonable jury could find for appellants. Fed.R.Civ.P. 56(c), (e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Our inquiry here is whether the pension-fund provisions of the agreement are reasonably susceptible to an interpretation that would require appellees to pay royalties on their output. *See Scott v. Anchor Motor Freight, Inc.*, 496 F.2d 276, 280 (6th Cir.1974) (where meaning of contract is uncertain or ambiguous, question of its meaning is for the jury; applied in section 301 suit); *Restatement (Second) of Contracts* § 212(2) (1981) (jury decides among competing, reasonable inferences from extrinsic evidence used to show meaning of contract).

### I.

In 1946, the UMWA and the Anthracite Coal Operators negotiated and signed the

[*] Honorable Clarkson S. Fisher, United States District Judge for the District of New Jersey, sitting by designation.

Anthracite Wage Agreement of 1946. The agreement established, among other things, a pension fund for miners financed by royalties to be paid by each operator signatory [1] "on each ton of anthracite produced for use or for sale." The agreement has been renegotiated seventeen times, most recently in 1981. The 1981 version of the agreement, which expired in 1984, is at issue in these appeals.

Since the 1940s, the structure of the anthracite coal industry has undergone fundamental changes, some of which have adversely affected the financing of the pension fund. In the 1940s, marketable coal was always processed after mining by a breaker, which is used to separate impurities and break up coal into smaller pieces. Coal operators were vertically integrated and almost always unionized. Thus a single, unionized operator would mine, process, and ship the coal. The practice of the signatories of the anthracite agreement was to pay royalties on the tonnage remaining after the coal was processed through a breaker. Since all coal was processed with breakers, and since the breakers were always operated by signatories, royalties were paid on most, if not all, marketable anthracite.

In recent years, the industry has become less unionized and less vertically integrated, and breakers are not necessarily used to make coal marketable. As a result, nonsignatories often operate breakers, and signatories often treat anthracite without breakers.

Breakers are also not always used in processing culm, a byproduct of anthracite processing. Considered waste in the 1940s because of its high ash content, culm was not subject to royalties. It can now be reprocessed [2] to remove some of the ash, rendering the resulting product usable for fuel.

Despite these changes in the coal industry, the phrase "produced for use or for sale" has survived—intact and without clarification—the seventeen renegotiations of the collective-bargaining agreement. The 1981 version of the pension-fund provisions contains only two changes from prior versions: The royalty on coal "produced for use or for sale" was raised from $1.50 to $1.60 per ton, and a separate royalty rate of 20 cents per ton was created for "[a]nthracite coal processed through a coal preparation plant and containing an ash content of 18% or higher."

Appellee Gil–Pre Corp. pre-processes culm. It does not use a breaker for this processing. After Gil–Pre's treatment, its product has an ash content of 60%.[3] Gil–Pre's product must be further processed before it is commercially usable as fuel. Gil–Pre does not perform that processing.

Appellee Gilberton Energy Corp. buys coal that is already commercially usable as fuel and then bags it for use as a filter medium in water-filtration systems. Gilberton Energy does not process its coal in a breaker or by any other means.[4]

---

**1.** The term "operator" is not defined in the Agreement. Appellees do not dispute the conclusion that if they have "produced anthracite for use or for sale," they are "operators" within the meaning of the anthracite agreement.

**2.** The higher the ash content of coal, the less heat it generates per unit, and the more pollutants it gives off in the burning process. Thus, the higher the ash content, the lower the per-unit value of the coal.

**3.** This fact is established by an uncontradicted affidavit submitted by Gil–Pre. At oral argument, counsel for the pension fund argued for the first time that more discovery was needed to determine whether this figure was correct. This argument was never made before the district court. The correct procedure would have been for counsel to file a Rule 56(f) affidavit explaining why it needed more time to obtain discovery

and indicating the specific facts regarding which it hoped to uncover evidence. *Dowling v. City of Philadelphia*, 855 F.2d 136, 139–40 (3d Cir.1988); *Falcone v. Columbia Pictures Inds.*, 805 F.2d 115, 117 n. 2 (3d Cir.1986).

**4.** The parties argue over whether coal bought by Gilberton was previously handled by signatories and whether coal treated by Gil–Pre is subsequently handled by signatories. Appellants have sought more discovery on this question. As we have noted, the proper procedure for seeking further discovery when a litigant is faced with a summary-judgment motion is to file an affidavit in accordance with Rule 56(f). *See supra* note 3. We need not reach the questions of whether appellants may have nonetheless constructively satisfied the requirements of that rule, *see Mid–South Grizzlies v. National Football League*, 720 F.2d 772, 780 (3d Cir.1983),

## II.

### A.

This is not the first time the courts of this circuit have been called upon to interpret the phrase "anthracite produced for use or for sale" as used in a collective bargaining agreement between the UMWA and the Anthracite Coal Operators. In *Thomas v. Blue Coal Corp.*, 355 F.Supp. 510 (M.D.Pa.1973); *aff'd by judgment order sub nom. Savitsky v. Blue Coal Corp.*, 485 F.2d 681 (3rd Civ.1973), the district court interpreted the disputed language in the context of an earlier version of the agreement now before us. In *Thomas*, culm was processed through a breaker by a nonsignatory. The defendant then blended the nonsignatory's coal with its own. In addressing the issue of whether that blending constituted "production" under the agreement, the court held that coal is "produced for use or for sale" when it is "first made marketable or usable as fuel." Since marketability of the anthracite as fuel had first occurred when the coal was processed through a breaker by a nonsignatory, the *Thomas* court concluded that the defendant was not liable for royalties on the coal that it sold. As the court correctly pointed out, its reading of the relevant phrase is not only consistent with the language of the agreement, but also necessary to avoid liability for multiple royalties on the same coal.

This court affirmed the decision of the district court in *Thomas* by judgment order. As a result, the *Thomas* case is not precedent binding on this court.[5] As we will see, however, the existence of the decision in that case is nonetheless of substantial assistance in resolving the issue before us.

### B.

As we have noted, the district court in this case concluded that "where the An-

thracite Wage Agreement refers to 'anthracite produced for use or for sale,' the parties intended that the provision be synonymous with ... 'anthracite ... processed through a coal preparation plant.'" Mem. op. at 10–11. In support of this conclusion, the district court cited the *Thomas* decision, the course of dealing between the parties, negotiations between the parties, and a 1981 amendment to the agreement pertaining to coal with high ash content. We find the district court's reasoning unpersuasive.

### 1.

The district court misread the *Thomas* decision. While the *Thomas* court noted, as an undisputed fact, that the coal purchased and intermingled by the defendant had first become marketable as fuel when it passed through the breaker, it had no occasion to consider whether a royalty was due on coal that had not been processed through a breaker. Accordingly, *Thomas* did not come to the conclusion—whether in its holding, dicta, or by implication—that "anthracite produced for use or for sale" meant "anthracite processed through a coal preparation plant." As we have noted, the *Thomas* court held that the disputed phrase referred to anthracite processed to the point where it first became marketable or usable for fuel.

### 2.

The district court in this case correctly noted that the parties to the agreement historically followed the practice of measuring the coal produced at the outflow of the breaker and of paying the royalty based upon that measurement. The court then concluded that this practice narrowed the meaning of the phrase "produced for use or for sale" to *require* the use of a breaker. We find the historic practice of the parties in this regard far less significant than did the district court.

---

and if so, whether the district court erred in not granting further discovery, because we find that regardless of prior or subsequent treatment by signatories, appellants do not owe royalties under the pension-fund provisions.

**5.** *In re Reading Co.*, 524 F.2d 324, 326 n. 1 (3d Cir.1975); Internal Operating Procedures, United States Court of Appeals for the Third Circuit, ch. 6 at 17 (August 1986).

In determining whether the practice of using the breaker was a "course of dealing" or "course of performance" implicitly limiting a term in the contract,[6] we must first consider the capacious language chosen by the parties. On its face, there can be no doubt that the phrase "produced for use or for sale" does not *require* the use of a breaker; and a reasonable inference, at least without contradictory evidence, from the persistent use of this phrase would be that the parties were indifferent as to the particular method of processing. Our inquiry, then, must be whether the parties' practice represents a meaningful decision—an implicit choice—to restrict the broad language and replace it with implied terms defined by their conduct.

Because the breaker was the only method used in the coal industry to bring coal to a marketable state, the initial use by the parties of the breaker, and their continued practice, does not represent a choice among possible alternatives. Acquiescence in that use does not represent implied assent to a breaker requirement where it was the only available option. Nor can that pattern of use "establish a common basis of understanding," U.C.C. § 1–205(1), that coal subject to royalties would be limited to that processed in a breaker. No meaningful basis of understanding can be inferred to limit a term to its means of performance where that performance is the only feasible method at the time.[7]

### 3.

The district court also found that the UMWA's attempt and ultimate failure in negotiations during 1975 to alter or clarify the disputed phrase was further evidence of the parties' belief that only coal treated in a breaker was subject to royalties.[8] This argument, however, relies on an assumption of its conclusion. The district court itself found that the language in issue was ambiguous—capable of meaning that a breaker is not required, but not explicitly indicating that nonbreaker processing was included. That the UMWA attempted to make explicit what remained ambiguous does not somehow render the meaning of the language unambiguous. A party may wish to modify language to increase the probability that courts will see things its way. Retention in the 1981 version of the prior language shows only that *both* parties failed to make express or articulate more precisely the meaning they wished to attribute to the phrase.

### 4.

Finally, we are unable to agree with the inference drawn by the district court from the following language inserted in the agreement in 1981:

It is further agreed by the parties hereto for the period beginning June 1, 1981 and ending when this Agreement is terminated that on anthracite coal *processed through a coal preparation plant* and containing an ash content of 18% or higher, there shall be paid a royalty of 20 cents per ton.

Payments shall be made on the 15th day of each and every month during the term of this Agreement for all *such high ash anthracite coal produced for use or sale* during the preceding month. (emphasis added)

---

6. The Uniform Commercial Code, which offers guidance by analogy, describes *course of dealing* as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing their expressions and other conduct." U.C.C. § 1–205(1). Course of performance, also relevant here, is described as follows: "Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." U.C.C. § 2–208(1).

7. Our conclusion might be different if the record indicated that the fund knowingly acquiesced while the signatories did not pay royalties on coal processed to a condition similar to that of coal run through a breaker, but by using other, more modern technologies than the breaker.

8. The UMWA attempted expressly to provide for a separate royalty on coal reclaimed from culm banks. Memorandum and Order at 4.

The district court determined that, as a matter of syntactical structure, the two sentences treated "anthracite coal processed through a coal preparation plant" and "coal produced for use or sale" as equivalents. The two sentences, in the view of the court, therefore provided persuasive evidence that the parties intended that, for coal to be considered "produced for use or sale," it must always be "processed through a preparation plant."

We believe one can infer from this choice of language in the 1981 amendment that, in the parties' view, "anthracite coal processed through a coal preparation plant" is "coal produced for use or sale." It does not follow from this undisputed fact, however, that "coal produced for use or sale" was intended to be limited to coal that has been processed through a breaker.

### III.

While we reject the district court's interpretation of the disputed phrase, we may nevertheless affirm its judgment if the record established that Gil–Pre and Gilberton are not liable for royalties under the only reasonable reading of that phrase that has been suggested. We hold that the only reasonable interpretation is the one articulated in *Thomas:* "produced for use or for sale" means "first made marketable or usable as fuel." Since Gil–Pre's product is not usable *as fuel,* and since Gilberton was not the *first* to make its product usable as fuel, we will affirm the judgment of the district court.

### A.

Although *Thomas* did not decide whether "production" is limited to breaker processing, the court clearly held that "produced" means "first made marketable or usable as fuel." The *Thomas* court was also careful to articulate its view that "production" under the agreement occurs only once: "Every subsequent improvement in [the coal's] value or quality would not constitute production." 355 F.Supp. at 512.

Thus *Thomas* squarely rejects the notion that any kind of treatment or handling of coal could constitute "production," and that "production" can occur an infinite number of times over the life of a given unit of coal.

In *Carbon Fuel Co. v. United Mine Workers of America,* 444 U.S. 212, 222, 100 S.Ct. 410, 416, 62 L.Ed.2d 394 (1979), the Supreme Court found that readoption of language interpreted by the courts "strongly suggests" that the parties incorporated that judicial interpretation into their contract. Twice since *Thomas*—in 1975 and 1981—the UMWA and the Anthracite Coal Operators have sat down to negotiate new versions of their collective-bargaining agreement. Both times they readopted without change the phrase that had been clearly and unequivocally interpreted by the district court in *Thomas.* In view of the clarity of the *Thomas* court's conclusion regarding the language at issue here and the two chances the parties had to renegotiate, the conclusion that they adopted the *Thomas* court's interpretation seems particularly compelling in this context.

Appellants do not challenge the principle articulated in *Carbon Fuel.* In fact, at one point in their brief, they seem to concede its validity, noting that "the parties were impliedly bound only to the holding that coal is produced for use or for sale when it is first made marketable or usable as fuel." Br. of Appellants at 34. Elsewhere, however, they argue that *Thomas* should be overruled. *Id.* at 37. This misses the point. Regardless of the soundness of *Thomas'* conclusions, *Thomas* provides strong evidence of what the parties intended when they readopted the language interpreted in that case.

### B.

Even if we were to ignore *Thomas'* value as evidence of the parties' intentions, however, we find that court's conclusion to be well founded and appellants' proposed in-

terpretations of the disputed language to be untenable.

### 1.

Appellants first argue regarding Gil–Pre that "production" occurs when coal becomes "marketable," and "marketability," they assert, occurs when coal or a coal product first "attains market value" or is "commercially worthwhile to save." Adopting this theory would presumably require Gil–Pre—whose processed culm has a 60% ash content—to pay royalties because it takes a byproduct—culm—and "produces" something that can be sold.[9]

Appellants' assertion that marketability and hence production means "attaining commercial value" is belied by language in the agreement. Paragraph 18 of Article 11 states: "All rights granted in this Agreement to the Trustees shall be applicable and binding on all suppliers of raw coal to Operators producing coal for use or for sale." This section clearly implies that the supplier, who may have mined coal and hence endowed it with "commercial value," has not "produced coal for use or for sale." To "produce," therefore, one must do something other than merely deal in a saleable product.

Moreover, appellants' theory makes no sense. The 1981 agreement provides that $1.60 per ton is to be paid on "anthracite produced for use or for sale," but it also provides that only 20 cents per ton is to be paid on "anthracite coal processed through a coal preparation plant and containing an ash content of 18% or higher." Article 11 par. 2. Appellants' broad interpretation of "produce" would require Gil–Pre to pay the $1.60 amount on its product, since, in appellees' view, Gil–Pre's product had attained a market value and was not processed by a "coal preparation plant." Recalling that Gil–Pre's product had an ash content of 60%, we find it quite implausible that the parties could have intended to require a royalty on coal such as Gil–Pre's that would be eight times as high as that assessed on coal that contained one-third the amount of ash as Gil–Pre's product. The fact that the parties agreed to the much lower figure for inferior-quality coal demonstrates that where lower quality coal, with an attendant lower value per ton, was to be considered subject to royalties, the parties bargained for a lower royalty proportional to the lower value of the coal. It would be anomalous to read the agreement as requiring Gil–Pre to pay, on its 60% ash product, a rate eight times higher than that paid on coal with one-third as much ash.

### 2.

Appellants face two daunting hurdles regarding Gilberton Energy's products. First, appellants' "first attaining market value" theory, even if valid, would not require royalties from Gilberton Energy, since, as appellants concede, the coal it purchases for use as a filter medium is already marketable. Second, appellants must reasonably explain how the bagging of filter media constitutes "production" within the meaning of the pension-plan provisions.

Regardless of the correct meaning of "produce," appellants' attempts to characterize Gilberton as the *first* to produce are feeble. Appellants argue that a nonsignatory can never be a "producer"—its activities are irrelevant for royalty purposes. When examining which miner, processor, or packager of coal is liable for royalties as a "producer," only the first *signatory* should be considered a "producer" because "the language of the Wage Agreement should not be interpreted with reference to the activity of a non-signatory." Brief of Appellants at 43.

---

**9.** Even if we were to adopt Appellants' theory of "production," it is not entirely clear that Gil–Pre was the *first* to make the culm "commercially marketable." With Gil–Pre's process of bringing the culm to a 60% ash content, culm ought no longer to be considered a useless byproduct —it already has some commercial value when it is first created as a byproduct. Indeed, it is possible (although the record here does not so indicate) that Gil–Pre itself purchased the culm it uses. We need not decide whether Gil–Pre was the first to make its product commercially marketable, however, since we reject Appellants' theory of what constitutes "production."

It strikes us as curious to assert that because language in an agreement is drafted for the use of the parties, it therefore necessarily does not refer to the activities or property of nonparties. If a contract calls for the delivery of the first robin of spring, a party's delivery of the second robin of spring does not somehow become a conforming tender because it is the first robin of robins delivered by parties to the agreement. The contracting party must meet the description in the contract, and only that description, whatever that description means. Thus, if "produced for use or for sale" means "the first time coal is produced for use or for sale," Gilberton's production does not become the "first" because it is the first *party* to "produce."

Even if Gilberton could somehow be viewed as the "first," however, finding that Gilberton's bagging operations constituted "production" under the agreement would play havoc with the parties' likely intentions. Appellants' "attaining market value" theory would require royalties to be paid at any and all stages of processing or even packaging (as in Gilberton's case), depending on what sort of activity the first signatory is engaged in. This would render the pricing structure of the agreement nonsensical. Under appellants' theory, coal would have been potentially subject to the $1.60 royalty both when first mined from the ground (because it then "attained commercial value") or, many steps of processing later, when bagged for use in water purifiers (because any subsequent refinement or processing of the coal would constitute "production"). The royalty assessed would thus bear no relationship to the value per ton of the signatory's product. We cannot presume that parties, in bargaining against a background of certain assumptions of profitability related to tonnage, would intend their agreement to apply to such disparate profitability scenarios.

Further, as the *Thomas* court pointed out, if every stage of processing, treatment, or handling were potentially to be considered "production," multiple payments would result unless a procedure were in effect to determine whether royalties had been previously paid. Appellants' answer to this problem—that they are not seeking multiple royalties—misses the mark. Under appellants' theory, to avoid multiple royalty payments, each signatory would have to know the provenance of each piece of coal, regardless of stage of treatment, to determine whether royalties had been already paid on it. Because the agreement makes no provisions for the attendant complexities of such a regime, and appellants offer no proof that such scrutiny of purchased coal has ever been practiced by signatories, we are left to conclude that the parties never intended "produce" to have such a sweeping meaning.

By contrast, the *Thomas* court's interpretation makes sense because it is premised on the notion that the coal is subject to royalties at only one stage of processing. This conclusion conforms with the pricing structure of the agreement: coal is weighed for royalty purposes at a stage in processing at which it has attained a certain value-per-ton. The only stage the parties appear to have considered appropriate is when the coal is first made marketable or usable as fuel.

IV.

Because neither Gil–Pre nor Gilberton Energy was the first to make its product marketable or usable as fuel, we will affirm the judgment of the district court.