**Emmett THOMAS et al., Plaintiffs,**

v.

**BLUE COAL CORPORATION,**
**Defendant.**

**Civ. No. 71-46.**

United States District Court,
M. D. Pennsylvania.

March 9, 1973.

Charles A. Shea, Jr., A. Richard Caputo, Wilkes-Barre, Pa., Thomas N. O'Neill, Jr., Philadelphia, Pa., for plaintiffs.

Bernard J. Brown, Franklin B. Gelder, Ashley, Pa., James E. O'Brien, Scranton, Pa., for defendant.

OPINION

MUIR, District Judge.

### I.  FINDINGS OF FACT

1.  The Plaintiffs are the Trustees of the Anthracite Health and Welfare Fund, a Trust with its principal place of business located in Hazleton, Pennsylvania.  (Uncontested Fact.)

2.  The Defendant is a Pennsylvania corporation which has its principal place of business located at 101 South Main Street, Ashley, Pennsylvania.  (Uncontested Fact.)

3.  In the course and conduct of its business, Defendant produced a substantial amount of anthracite coal for use or for sale which was subsequently transported and delivered in interstate commerce.  (Uncontested Fact.)

4.  The United Mine Workers of America is a labor organization representing employees in the coal industry.  (Uncontested Fact.)

5.  At all times material to this case, the Defendant was a party to the Anthracite Wage Agreement of September 1, 1966 and the Anthracite Wage Agreement of April 1, 1969.  Both of said agreements were between coal operators and the United Mine Workers of America.  Pursuant to the terms of both of the aforesaid Anthracite Wage Agreements, the Defendant agreed to pay Plaintiffs as a royalty the sum of Seventy Cents (.70) per ton on all anthracite produced by it for use or for sale.  (Uncontested Facts.)

6.  Between January 1, 1968 and May 31, 1970 inclusive, Defendant purchased eighty-five thousand two hundred and eighty-one (85,281) tons of coal from Olyphant Premium Anthracite, Inc. The coal was delivered by rail to De-

fendant's Huber Colliery. (Uncontested Facts.)

7. Olyphant Premium Anthracite, Inc. was not a signatory to the above Anthracite Wage Agreements. (T. 78.)

8. No royalty was paid to the plaintiffs on the aforesaid 85,281 tons of coal by anyone. (Uncontested Fact.)

9. The coal in question had lain in a culm or refuse bank for years before it was reclaimed and processed through the Olyphant Premium Anthracite Breaker in Olyphant, Pa., prior to its sale and shipment to Defendant. (T. 87.)

10. The coal in issue was processed through the Olyphant Premium Anthracite Breaker, a heavy media breaker with modern sophisticated equipment which removed impurities from the bank material and sized the coal into five commercial sizes: stove, nut, pea, buck and rice. (T. 14; 39; 86–88.)

11. Prior to the development of the above equipment, the coal in said culm or refuse bank could not be extracted economically. (T. 87.)

12. After it went through the Olyphant Breaker the coal tested to a 10 to 12 percent ash content which was within acceptable standard limits for anthracite in Pennsylvania. (T. 93, 94.)

13. Defendant's Huber Breaker and the Olyphant Breaker were similar in process and equipment. (T. 97; 111.)

14. The coal was commercially marketable when it left the Olyphant Premium Anthracite Breaker. (T. 86; 92; 114–115.)

15. The Olyphant coal was distinguishable principally by its color which was variously described as discolored (T. 12), dull in appearance (T. 14; 49; 88) and not shiny like ordinary coal.

16. The dull appearance of the coal was due to the fact that it had lain on the bank for years and had partially oxidized. (T. 88.)

17. When it arrived at Defendant's Huber Breaker at Ashley, Pa., the coal purchased from Olyphant Premium Anthracite was blended, mixed or intermingled with other coal, including run of the mine coal, by the Defendant. (T. 25; 41–42; 88–89.)

18. The coal was blended in a variety of ways, one of them being to run it through the breaker with coal from another source. (T. 123–124.)

19. The coal was also blended at the Huber Breaker by mixing it with other coal on the ground and also by dumping it in outside pockets with other coal. (T. 124.)

20. The Olyphant coal was not crushed in the Huber Breaker. (T. 25–27.)

21. The only significant effect of the Olyphant Coal going through the Huber Breaker was that it was thus mixed or blended with other coal. (T. 91; 132–133.)

22. Coal came from many different sources to the Huber Breaker. (T. 65; 116.)

## II. DISCUSSION

Plaintiffs contend that Defendant Blue Coal Company "produced" the 85,281 tons of coal at issue here "for sale or for use" within the meaning of the Anthracite Wage Agreements. In my view, the coal was produced for use or for sale when it was first made marketable or useable as fuel.[1] This occurred when it was processed through the Olyphant Coal Company breaker. Every subsequent improvement in its value or quality would not constitute production. Had the parties to the Wage Agreements intended otherwise, Plaintiffs would in some instances receive multiple royalty payments from different companies for the "production" of the same load of coal. The instant case would have been such an instance if Olyphant Coal Company had been a signatory to the Wage Agreements and if Plaintiffs' claim against Blue Coal Company were to be upheld.

[1]. See Lewis v. Kerns, 175 F.Supp. 115, 118 (S.D.Ind.1959); Haynes v. Eagle-Picher Company, 295 F.2d 761, n. 2 at 765 (10th Cir. 1961).

Plaintiffs have not sustained their burden of proving that multiple payments were made or were contemplated by the parties to the Wage Agreements. That Olyphant Coal Company was not a party to the Wage Agreements is not relevant to this reasoning or to the Court's interpretation of the term "produced for use or for sale."

### III. CONCLUSIONS OF LAW

██ 1. The Court has jurisdiction of the subject matter of this action under 29 U.S.C. § 185(a).

██ 2. The coal in question was not "produced for use or for sale" by the Defendant within the meaning of the contract between the parties.

3. There is no royalty due from Defendant to Plaintiffs on this coal.