Harry HUGE et al., Plaintiffs,

v.

John J. ONDESKO et al., Defendants.

Civ. A. No. 74–1082.

United States District Court,
W. D. Pennsylvania.

June 28, 1976.

**817**

Jack W. Plowman, Pittsburgh, Pa., for plaintiffs.

Ferdinand F. Bionaz, Johnstown, Pa., for defendants.

## OPINION

JOHN L. MILLER, Senior District Judge.

This labor case, brought pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, involves the basic question of whether the defendants are obligated to pay into the pension fund that is administered by plaintiffs pursuant to the 1971 coal wage agreement. Much of the factual background is not in dispute; thus, the following account, submitted by stipulation[1], is adopted by the Court.

Plaintiffs are the Trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950 (Fund), a trust with its principal office located in Washington, D. C. Defendants, whom we shall hereafter collectively refer to as Dunlo Construction Company (Dunlo), are all citizens and residents of the Commonwealth of Pennsylvania and are engaged in the business, *inter alia*, of salvaging[2] coal mine refuse in and about Central City, Somerset County, Pennsylvania.

The United Mine Workers of America Welfare and Retirement Fund of 1950 was created by the National Bituminous Coal Wage Agreement of 1950.

On or about November 12, 1971, Dunlo and the United Mine Workers of America entered into the National Bituminous Coal Wage Agreement of 1971 (1971 Agreement). Under Article XV, Section (a) of the 1971 Agreement[3], Dunlo was required to pay into the Fund the sum of sixty cents ($.60) per ton for each ton of *coal produced for use or for sale* during the period November 12, 1971, through and including November 11, 1972, and the sum of sixty-five cents ($.65) per ton for each ton of coal produced for use or for sale during the period November 12, 1972, through and including May 11, 1973, and the sum of seventy cents ($.70) per ton for each ton of coal produced for use or for sale during the period May 12, 1973, through and including November 11, 1973, and the sum of seventy-five cents ($.75) per ton for each ton of coal produced for use or for sale during the period November 12, 1973, through and including May 11, 1974, and the sum of eighty cents ($.80) per ton for each ton of coal produced for use or for sale during the period May 12, 1974, through and including September 30, 1974.

During the period November 12, 1971, through and including September 30, 1974, Dunlo was engaged in the business of salvaging coal refuse in and about Somerset County, Pennsylvania. Dunlo also checked off and remitted union dues of its employees pursuant to the 1971 Agreement.

During the period November 12, 1971, through and including September 30, 1974, Dunlo salvaged coal from coal refuse piles

---

1. Plaintiffs' Exhibit (PX) No. 12.

2. For reasons that will be stated later the Court questions the parties' use of the term "salvage" in the stipulation.

3. PX No. 1, p. 13.

which were the property of Reitz Coal Company (Reitz), Central City, Pennsylvania. The workers employed in the salvage of the coal were members of the United Mine Workers of America.

All of the coal salvaged by Dunlo as aforesaid was sold and delivered to The Florence Mining Company (Florence) and to M. F. Fetterholf Coal Co., Inc. (Fetterholf).

At trial the following additional facts were established. Historically mine refuse, which can best be described as a by-product of the coal-mining process, has been an incidental problem to the industry. It is essentially a mixture of coal and other geological (but non-combustible) minerals or elements such as rock, slate and clay. Since the amount of coal in such mixtures is proportionally low, mine operators over the years have viewed the task of separating the saleable coal from the waste elements as economically impracticable. Thus this material, when removed from the mines, is set aside usually in large piles at or near the mine from which it came. While the material has come to be known by various terms—e. g., slag piles, rejects, rock dumps, culm banks—we shall refer to it as refuse.

Because this refuse is not marketable for consumption it must be processed through coal preparation and treatment facilities which, in recent years, have become equal to the task. The refuse-processing operations, run by some of the larger coal operators, have the net effect of maximizing our resources because part of the refuse is recoverable as coal and then resold for use as fuel.

█ During the period in question Dunlo sold and delivered approximately 41,000

tons of refuse to Florence and Fetterholf part of which, after being processed, resulted in recoverable coal.[4] Contrary to defendants' assertion that the coal contained in this refuse had previously been assessed the prevailing royalty rate, it is apparent to the Court that someone—Florence, Fetterholf or Dunlo—had to pay royalty on this "processed" coal under the 1971 Agreement. We infer as much because Dunlo, in its agreement to supply Florence with refuse, bore the responsibility of paying the royalty.[5] While the supply contract between Dunlo and Fetterholf is silent on this subject [6] we believe the practice in the industry was, unless otherwise agreed, for the supplier to incur the royalty obligation. We make this finding because nowhere in the record is there even a hint that Fetterholf paid into the fund on recoverable coal. Moreover, a letter to Dunlo from Fetterholf stating that prior deliveries of refuse were found to have a recovery range between 30%–52.5% indicates that Dunlo was to pay royalty on the amount of coal recovered.[7] Added to all of the above is the fact that Dunlo *paid* royalties on the tonnages of recoverable coal in the amount of $12,507.00 in accordance with the 1971 Agreement.[8]

Sometime in 1972, however, Dunlo stopped paying royalties into the Fund, apparently believing that such contributions were not mandated by the 1971 Agreement. The figures for clean tonnage and corresponding royalty amounts allegedly due under the contract are not disputed; thus, if Dunlo is liable for pension contributions the amount owing is $9,960.25 plus interest.[9]

There is another important factual aspect to this case. Dunlo did not actually "sal-

---

4. Because the parties did not request the record to be transcribed we can not cite to specific pages. Our notes indicate that such a finding is supported by the testimony of Messrs. Motillo, Ghezzi and Mastrine. *See also* PX Nos. 2, 7, 9, 10, and 11.

5. The agreement, as constituted by a series of purchase orders, contains the following provision: "United Mine Workers of America royalty payment to be paid by supplier." *See* PX No. 2.

6. *See* PX No. 4.

7. *See* PX No. 8.

8. Dunlo has counterclaimed for this amount.

9. *See* PX No. 11. Our reference to the amount as being "undisputed" is based solely on the fact that Dunlo offered no evidence challenging the calculation of the claim made by the Fund's accountant.

vage" refuse coal. We find that Dunlo merely acted as a middleman in transporting the refuse from Reitz to Florence and Fetterholf. Indeed, Henry F. Ghezzi, Director of Coal Preparation and Coal Purchasing for Fetterholf, stated that the refuse was merely purchased from Dunlo. It was Fetterholf who processed the refuse through its coal treatment facilities to recover coal for eventual sale to customers for fuel.

Likewise Elmer Motillo, Mine Accountant for Florence, stated that the refuse was bought from Dunlo, weighed in, refined and processed for later resale to power generating stations.[10]

### DISCUSSION

At trial Dunlo called but one witness, Mr. John J. Ondesko, to establish a factual defense that royalties had already been paid on the coal contained in the subject refuse by coal operators who had contributed to the piles. While the Court would be justified in ignoring this testimony,[11] we wish to note that the evidence does not substantiate Dunlo's position. Our review of the record indicates that, with few exceptions, Mr. Ondesko could not even identify the coal operators who contributed to the refuse piles in question. Thus, finding little, if any, direct evidence to support this defense we conclude that Dunlo has failed to sustain its burden of proof on the defense of payment.

The pivotal question here is whether the material which was sold and delivered by Dunlo to Florence and Fetterholf constituted "coal" within the meaning of that term as used in the 1971 Agreement. We turn to the contract.

The parties attach particular importance to the following language from Section (a) of Article XV:

> During the life of this agreement, each operator signatory hereto shall pay into such Fund on each ton of . . . bitu-

minous coal *produced by such operator for use or for sale* an amount as follows . . . . (Emphasis added.)

Dunlo argues that the above provision—and therefore, the 1971 Agreement—is inapplicable because it did not "produce" coal while plaintiffs contend that Dunlo did produce coal for use or sale as contemplated by the labor contract.

■ In our opinion Dunlo produced nothing. It merely purchased the refuse from Reitz, sold it to Florence and Fetterholf, and effected the deliveries. We do not believe its limited activities constitute the *production* of coal for use or for sale as contemplated by the above quoted passage. Our view of the matter is squarely supported by *Thomas v. Blue Coal Corp.*, 355 F.Supp. 510 (M.D.Pa.1973), a case quite similar factually to the one before us.

In *Thomas*, trustees of the Anthracite Health and Welfare Fund sought to compel the defendant coal operator to pay a royalty per ton on all anthracite produced by it for use or sale. Blue Coal had purchased some 85,000 tons of coal refuse for eventual resale for fuel. This refuse had been *processed* by a third party before it reached Blue Coal. In holding that Blue Coal was not liable for the royalties, Judge Muir reasoned as follows:

> Plaintiffs contend that Defendant Blue Coal Company "produced" the 85,281 tons of coal at issue here "for sale or for use" within the meaning of the Anthracite Wage Agreements. In my view, the coal was produced for use or for sale when it was *first made marketable or useable as fuel*. This occurred when it was processed through the Olyphant Coal Company breaker. Every subsequent improvement in its value or quality would not constitute production.

*Thomas v. Blue Coal Corp., supra,* at 512. (Emphasis added.) (Footnote omitted.) There is no dispute that the refuse in ques-

---

**10.** *See* Plaintiffs' Request for Findings of Fact, Nos. 16–21.

**11.** Over plaintiffs' objection we permitted Mr. Ondesko to testify despite Dunlo's failure to reveal such a defense in its Pretrial Narrative. *See* Local Rule 5 II(C)(3).

tion was not converted to useable or marketable coal until it was processed by either Florence or Fetterholf. Therefore, as Dunlo contends, the above language does not appear to support plaintiffs' position.

■ We must, of course, look to the entire agreement to ascertain the parties' intentions. Further examination of Article XV reveals this pertinent language:

> On all bituminous coal procured or *acquired* by any signatory operator for use or for sale (i. e., all bituminous coal *other than that produced* by such signatory operator), there shall, during the life of this agreement, be paid into such Fund by each such signatory operator hereto . . . an amount per ton which is equal to the amount which would be payable hereunder if the signatory operator had produced the coal for use or sale plus forty cents (40¢) per ton on each ton of such bituminous coal so procured or acquired on which the amount per ton payable hereunder on coal produced for use or sale had not been paid into said Fund prior to such procurement or acquisition. (Emphasis added.)

The Court reads the above excerpt to include the mere acquisition of mine refuse (which contains recoverable coal) for resale to a processing entity. We therefore conclude that Dunlo is liable for the amount of royalties claimed under the 1971 Agreement.

Dunlo nevertheless argues that saleable coal salvaged from refuse was not contemplated by the 1971 Agreement and points to the 1974 National Bituminous Coal Wage Agreement (1974 Agreement)[12] of which Article XX Section (d)(2) provides:

> The trustees are hereby directed to establish a royalty rate or rates for bituminous coal which is recovered from slurry ponds, sludge piles, and other coal refuse, which is sold during the life of this Agreement, and such royalty rate will be paid on each ton of such coal recovered for use or for sale.

Dunlo contends that this language supports its position that the 1971 Agreement did not contemplate coal salvaged from refuse. We cannot agree. This language merely indicates that the parties desire a new royalty rate for coal derived from mine refuse. Our conclusion is supported by the very next sentence in Section (d)(2) of the 1974 Agreement:

> Royalty rates *currently* being paid for coal recovered from slurry ponds, sludge piles and other coal refuse shall remain in effect unless and until changed by the Trustees. (Emphasis added.)

Moreover, Article II, Section (f)(1) of the 1971 Agreement provides:

> The following work shall be performed solely by members of the United Mine Workers of America and will be covered by this Agreement:
>
> (1) all hauling of coal, overburden, mine refuse in or about the mine, including hauling to a screening, crushing, washing or other preparation facility, or other contiguous mine-related operation.

We believe the 1971 Agreement contemplates the payment of royalties on *all* coal eventually sold for fuel, whether clean upon excavation or recoverable from processing. *See Lewis v. Kerns,* 175 F.Supp. 115 (S.D. Ind.1959). Accordingly, judgment on the claim shall be entered for plaintiffs in the amount of $9,960.25 plus interest.[13] Our decision, needless to say, has the operational effect of granting judgment adversely to Dunlo on its counterclaim.

One final question remains for disposition. Plaintiffs contend that they are entitled to attorney's fees and audit expenses incurred in the course of recovering the delinquent royalties. After careful consideration of the authorities we conclude that plaintiffs are not entitled to an award of attorney's fees and other expenses of litigation.

---

12. Defendant's Exhibit (DX) B.

13. Because Dunlo has not computed interest on the amount owing or disputed plaintiffs' theory of same, we shall accept as accurate plaintiffs' computation of interest up to April 10, 1976. *See* Plaintiffs' Request For Findings of Fact, No. 25 and PX No. 14.

Only last year the United States Supreme Court had occasion to again consider the issue when it rejected the "private attorney general" theory as a means for sidestepping the firmly-entrenched and restrictive "American Rule" which militates against awarding attorney's fees to a prevailing litigant in federal litigation. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). While tracing the rule's history—and reaffirming its vitality—the High Court instructed that such awards cannot be taxed against the losing party *unless* permitted by statutory authorization, enforceable contract, or one of the few recognized exceptions. *See Alyeska Pipeline, supra*, at 254–62, 95 S.Ct. 1612.

Plaintiffs, of course, are not proceeding under any federal statute that authorizes an award of reasonable attorney's fees; thus, that avenue is accordingly closed.

While the 1971 Agreement does contemplate the use of audits,[14] nowhere does it reflect language that could serve as a basis for making such an award. Plaintiffs are therefore again without solid ground for asserting such a claim.

Remaining then for our consideration are the judicially-created exceptions to the general rule. In *Alyeska Pipeline, supra*, at pp. 257–59, 95 S.Ct. 1612 the Court notes that these three exceptions, to wit, (1) common fund suits, (2) disobedience by a party of a court order, and (3) bad faith or other reprehensible conduct on the part of a litigant, are applicable only in very limited circumstances. We find that the facts of this case do not fit any of the above exceptions. While plaintiffs may argue that their action, as trustees of a fund sought to be preserved for the benefit of a class, falls within the "common fund" exception, we believe that the majority opinion in *Alyeska Pipeline* dispels any doubt about its inapplicability with the remarks—in rebuttal to Justice Marshall's dissent—which indicate

that such fees are to be paid from the fund and *not* by the adversary party. *Id.* at p. 258, n. 30, 95 S.Ct. 1612. Therefore, we discern no legal footing upon which plaintiffs can premise a claim for counsel fees and expenses.

The authorities plaintiffs cite to us which awarded attorney's fees are inapposite. *Huge v. Lakeside Coal Co.*, C.A. 75–L–1173–NE (N.D.Ala.1976) is clearly distinguishable because that case was brought under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, § 1132(g) of which expressly provides for attorney fees and costs.[15] As for *Bugher v. Ohio Pipeline Construction Co.*, 392 F.Supp. 687 (S.D.Ohio 1975) we also perceive a key disparity. The court there, having observed that the parties had provided in writing for collection expenses incurred by the trustees, held the relevant contract to be enforceable, and made an award pursuant thereto. As noted earlier, the contract *sub judice* contains no mutual manifestation of intent with respect to fees and expenses attendant to redressing a breach.

Findings of fact and conclusions of law have not been separately stated but are included in the body of the foregoing opinion as authorized by Rule 52(a) of the Federal Rules of Civil Procedure.

An appropriate judgment order shall be entered.

14. Article XV Section (d), PX No. 1 at p. 15.

15. Parenthetically we note that such awards, even when authorized by statute, are often

subject to the discretion of the court. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. at p. 261, n. 35, 95 S.Ct. 1612.