**JEDDO–HIGHLAND COAL COMPANY, Plaintiff,**

**v.**

**DISTRICT 2, UNITED MINE WORKERS OF AMERICA, SUB–DISTRICT 4, and Local Union 1443, United Mine Workers of America, Defendants.**

No. 3:CV–93–0125.

United States District Court, M.D. Pennsylvania,

March 15, 1995.

Donald H. Brobst, James C. Oschal, Rosenn, Jenkins & Greenwald, Wilkes Barre, PA, for plaintiff.

Michael J. Healey, Healey, Davidson, & Hornack, Pittsburgh, PA, for defendants.

### *MEMORANDUM*

VANASKIE, District Judge.

This litigation under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, concerns an arbitrator's decision that the loading and hauling of "culm" owned by Morea Cogen, Inc. ("Morea") and located at a "coal breaker" operated by Plaintiff Jeddo–Highland Coal Company ("Jeddo–Highland") is subject to the work jurisdiction provisions of the Anthracite Wage Agreement of 1990 (hereinafter referred to as the "1990 AWA").[1]

1. "Culm" is defined as the "[w]aste from anthra-   cite coal mines, consisting of fine coal, coal dust

Jeddo–Highland, an employer in an industry affecting commerce within the meaning of 29 U.S.C. §§ 142 and 152, is a signatory to the 1990 AWA. The arbitrator held that the 1990 AWA applied to the removal of Morea's culm inasmuch as the 1990 AWA extends to "coal lands" owned by "affiliates" of signatories and Morea is an "affiliate" of Jeddo–Highland.

Jeddo–Highland seeks to vacate or modify the arbitration award on a number of grounds, including that (a) culm is not covered by the work jurisdiction provisions of the 1990 AWA; (b) Morea is not an "affiliate" of Jeddo–Highland; and (c) Morea's "dedication" of the culm in question to Wheelabrator Frackville Energy Company, Inc. ("Wheelabrator") grants to Wheelabrator the right to load and haul the culm in question without being subject to the work jurisdiction provisions of the 1990 AWA. Jeddo–Highland also challenges the award on the ground that it conflicts with a final ruling of the Court of Common Pleas of Schuylkill County, Pennsylvania in *Wheelabrator Frackville Energy Company, Inc. v. District 2, United Mine Workers of America, et al.,* No. S–2213–1992 (Nov. 9, 1992) (hereinafter referred to as the "Schuylkill County Action"). (*See* Docket Entry 41, Exhibit "I.") Finally, Jeddo–Highland contends that the award is contrary to public policy because it would preclude long-term arrangements for the supply of culm necessary to operate "co-generation" facilities.

Defendants, District 2, United Mine Workers of America, Sub–District 4, and Local Union 1443, United Mine Workers of America (hereinafter collectively referred to as the "UMW"), have asserted a counterclaim, requesting enforcement of the arbitration award. The UMW contends that the 1990 AWA extends to the loading and hauling of culm located on "coal lands" owned by a signatory operator or its affiliate. The UMW further contends that because both Jeddo–Highland and Morea are wholly-owned subsidiaries of Pagnotti Enterprises, Inc. ("Pagnotti"), the loading and hauling of culm owned by Morea is covered by the 1990

AWA. Finally, the UMW asserts that the work jurisdiction requirements of the 1990 AWA could not be defeated by the Wheelabrator transaction.

Both parties have moved for summary judgment. Because it is evident that (a) the work jurisdiction provisions of the 1990 AWA arguably extend to the loading and hauling of culm; (b) the 1990 AWA may be construed to extend to operations on coal lands owned or held by Morea as an affiliate of Jeddo–Highland; (c) the Wheelabrator transaction does not defeat the work jurisdiction provisions of the 1990 AWA; and (d) the decision in question is not inconsistent with either the Schuylkill County Action or public policy, the UMW's summary judgment motion will be granted and Jeddo–Highland's motion will be denied.

## BACKGROUND

### A. *The 1990 AWA*

The 1990 AWA is "the collective bargaining agreement that governs relations between anthracite-producing companies and UMW-represented workers in the anthracite industry." *International Union, UMW v. Racho Trucking Co.,* 897 F.2d 1248, 1249 (3rd Cir.1990). The specific work covered by the 1990 AWA is defined as follows:

> The *production, preparation, processing and cleaning of coal from* deep mining operations, strip operations, and *refuse banks,* and transportation of coal (except transportation of prepared coal), repair and maintenance work normally performed at the mine site or at a central shop of the Employer and maintenance of refuse banks and mine roads, *and work customarily related to all of above.... Contracting, subcontracting, leasing and subleasing* ... will be conducted in accordance with the provisions of this Article. *[1990 AWA, Article 2, § (a) (Docket Entry 41, Ex. "A," emphasis added).]*

Pursuant to Section (g) of Article 2 of the 1990 AWA, the collective bargaining agreement "covers the operation of *all of the coal lands owned* or held under lease by [signato-

and dirt," or as "[i]nferior anthracite coal." The American Heritage Dictionary of the English

Language 321 (1971). A coal breaker is a facility that processes materials containing coal.

ry Operators] or any of them, *or by any subsidiary or affiliate* at the date of this agreement or acquired during its term, which may hereafter (during the term of this Agreement) be put into production." (*Id.*) Article 2, Section (g) further provides that "[t]he Operators agree that they will not lease out any coal lands for the purpose of avoiding the application of this Agreement." (*Id.*)

Disputes arising under the 1990 AWA are subject to a mandatory grievance procedure, culminating in reference of the matter to the "Umpire" appointed by the Anthracite Board of Conciliation. (*Id.*, Article 18.) The Umpire's decision is "final." (*Id.*)

## B. *The Umpire's Decision Giving Rise to this Litigation*

In April of 1992, the UMW filed a grievance to protest the allegedly improper use of non-union workers on April 14 and 15, 1992 to remove and haul culm from a site known as the "Rosa Breaker," which is operated by Jeddo–Highland. (Docket Entry 41, Ex. "C.") The essence of the UMW's grievance was that the loading and transportation of culm is subject to the "work jurisdiction" provisions of the 1990 AWA.

Although the UMW originally contended that the culm in question was owned by Jeddo–Highland, it now acknowledges that the culm is instead owned by Morea. Both Morea and Jeddo–Highland are wholly-owned subsidiaries of Pagnotti. (Docket Entry 41, Ex. "G" at 37.)

Effective December 14, 1990, Morea dedicated the culm located at the Rosa Breaker site to Wheelabrator. (See the "Amended and Restated Supply and Disposal Agreement" (the "Amended Supply Agreement") Docket Entry 41, Ex. "I.")[2] As security for its obligations under the Amended Supply Agreement, Morea pledged its stock to Wheelabrator. The Amended Supply Agreement provided that Morea would not subject any of the "anthracite culm" to any lien, nor make any agreement that would allow any other person "the right to enter upon the Culm Sites and remove the anthracite culm thereon or otherwise take any action with respect to any anthracite culm that would . . . result in any impediment to [Wheelabrator's] removal of the anthracite culm from the Culm Sites." (Docket Entry 41, Ex. "D", at 4.) Jeddo–Highland is not a party to the Amended Supply Agreement.

The question of whether the loading and hauling of culm from the Rosa Breaker site falls with the 1990 AWA was submitted to the Anthracite Board of Conciliation (the "Board"), a joint management/labor dispute resolution committee established under Article 18 of the 1990 AWA. The Board conducted a hearing on September 1, 1992, at which both sides presented testimony that was transcribed. (Docket Entry 41, Ex. "G.")

Because the Board was unable to reach a decision, the UMW referred the grievance to Umpire Clyde W. Summers, who has served as the only neutral arbitrator under the anthracite wage agreements since the mid–1970s. (Summers Dep., Docket Entry 41, at 13.) It appears that he has served with concurrence of management and labor since that time. (*Id.* at 18.)

Umpire Summers conducted a hearing on December 10, 1992. The record before Umpire Summers included the transcribed testimony from the Board hearing, the record from the Schuylkill County Action, decisions on other grievances under the 1990 AWA, and a number of other pertinent documents, including the Amended Supply Agreement. (See Exhibits 3A through 3AA and 4 to the Summers' Deposition, Docket Entry 42.)

---

2. The Amended Supply Agreement appears to have been part of a settlement of litigation that concerned a 1986 agreement involving, *inter alia*, Pagnotti, Morea, and Wheelabrator pertaining to the construction and operation of "an anthracite culm waste-fueled steam-electric power co-generation facility." (*See* Docket Entry 41, Ex. "D.") The co-generation facility produces electricity, which is sold to the Pennsylvania Power & Light Company, and thermal energy which is sold to the Commonwealth of Pennsylvania for use at the State Correctional Institution at Frackville. For a description of the litigation that arose under the 1986 agreement, see *Wheelabrator Frackville Energy Co. v. Morea Culm Services, Inc.*, No. 90–2962, 1990 WL 83340 (E.D.Pa. June 12, 1990).

Umpire Summers issued his decision on December 18, 1992. He concluded that the loading and transportation of culm from the Rosa Breaker fell within the work jurisdiction provisions of the 1990 AWA and thus awarded two day's back pay and benefits to two UMW members for the removal of culm that occurred on April 14 and 15, 1992. (Docket Entry 27, Ex. "D.")

In his opinion, the Umpire rejected Jeddo–Highland's position that the removal from the culm bank was not a coal operation but the removal of waste which is largely stone, explaining:

> The culm bank contains coal, and although at one time it was not profitable to extract the coal, it is now economically feasible, and the culm bank is sold for the coal content in the culm. It is ultimately sized and crushed to extract the coal, which is then used as fuel. Indeed, it was described in the agreement between Pagnotti and Wheelabrator as "anthracite culm", indicating that it contained anthracite coal. [Docket Entry 27, Ex. "D" at 3–4.]

Moreover, because the material removed from the culm bank "was reprocessed through the breaker to extract more of the coal," the Umpire concluded that the 1990 AWA "specifically covers this, for Article 2, in describing the jurisdiction includes 'processing and cleaning of coal from . . . refuse banks.'" (*Id.* at 4.)

The Umpire also rejected Jeddo–Highland's argument that the Amended Supply Agreement was not a "lease of coal lands, but the purchase of the culm." The Umpire explained:

> The agreement further provides that, "Pagnotti Coal Company and Owner have granted to Operator and Landholder (Wheelabrator and Morea Cogen) the Disposal Site Easement" and that Pagnotti will "maintain and ensure the peaceful and quiet use and enjoyment by Operator and Landholder of the Culm Site Easements and the Disposal Site Easement." The agreement also permits Wheelabrator "to install screening equipment on the Culm Site and to keep such mobile equipment on the Culm Site as is necessary to facilitate screening and removal of the anthracite culm. [*Id.*]

\*   \*   \*   \*   \*   \*

Apart from whether this might in technical legal terms be described as a lease, it is quite clear that it comes within the intent and meaning of the word "lease" as used in the Wage Agreement. . . . Signatories to the Agreement were not to avoid the Agreement by leasing, contracting or any other form of transfer which allowed non-signatories to do work within the jurisdiction of the Agreement.

It is quite clear that if a signatory "dedicated" coal in the ground to a non-signatory, to be taken to the non-signatory's breaker for processing, the digging, loading and hauling would have to be done by Miners covered by the Wage Agreement. It is also quite clear that if coal, which had been dug and stacked at the mine site, were "dedicated" to a non-signatory, the loading and hauling would have to be done by miners covered by the Wage Agreement. . . .

The "dedication" of the culm bank here is in all substantial respects a "leasing" as that term is intended in the Wage Agreement. The loading and hauling of the culm is "transportation of coal" within the meaning of those words as used in Article 2, Section (a). [*Id.*][3]

### C.   *Procedural History*

Jeddo–Highland commenced this action on January 26, 1993. An Amended Complaint was filed on April 14, 1993. The UMW filed

---

**3.** Umpire Summers' decision also addressed another grievance, styled as a "class action," which requested that an order be entered directing Pagnotti and Jeddo–Highland to cease and desist from allowing non-union employees to remove culm from other Pagnotti-owned properties. As to that grievance, Umpire Summers concluded that the circumstances under which culm was being removed from other properties had not been fully developed and that it would therefore be inappropriate for him "to try to frame an order any broader than the specific violations proven, that is, the denial of two men work on two days at the Rosa Breaker." (Docket Entry 27, Ex. D at 7.)

an Answer and Counterclaim seeking enforcement of the Umpire's decision.

In November of 1993, the UMW moved for issuance of a preliminary injunction in this action and in a related action docketed to No. 93–1366. Concluding that the UMW had not established irreparable harm in the absence of preliminary injunctive relief, the Honorable James F. McClure, Jr. denied the UMW's Motion in a Memorandum and Order dated December 15, 1993. (Docket Entry 43.)

Following completion of discovery, which included Umpire Summer's deposition, both parties moved for summary judgment. (*See* Docket Entries 26 and 29.) This matter is ripe for disposition.

## DISCUSSION

### A. *Standard of Review*

Summary Judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. F.R.C.P. 56(c). Whether a fact is "material" is to be determined by the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this case, the applicable substantive law is that which governs judicial review of labor arbitration awards.

As explained in *Stroehmann Bakeries v. Local 776,* 969 F.2d 1436, 1441 (3rd Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 660, 121 L.Ed.2d 585 (1992), courts "generally have only a very limited power to review a labor arbitration award by an arbitrator appointed pursuant to a collective bargaining agreement." The district court does "not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *United Paperworkers International Union v. Misco,* 484 U.S. 29, 37–38, 108 S.Ct. 364, 370–71, 98 L.Ed.2d 286 (1987). Instead, "as long as the arbitrator's award is drawn from the essence of the collective bargaining agreement, a court may not vacate it even if the court finds the basis for it to be ambiguous or disagrees with its conclusions under the law." *Stroehmann,* 969 F.2d at 1441. "It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of a contract, the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers of America v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960).

The extremely limited nature of judicial review of labor arbitration awards was succinctly described in *News America Publications, Inc. v. Newark Typographical Union, Local 103,* 918 F.2d 21, 24 (3rd Cir.1990):

> "*As long as the arbitrator has arguably construed or applied the contract, the award must be enforced,* regardless of the fact that the arbitrator has committed a serious error.... This Court has held that *there must be absolutely no support at all in the record justifying the arbitrator's determinations for a court to deny enforcement of the award....* Thus, only where there is a 'manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award.' "

*Accord, Exxon Shipping Co. v. Exxon Seamen's Union,* 993 F.2d 357, 360 (3rd Cir. 1993).

In short, a court may vacate a labor arbitration decision only if it "does not draw its essence from the collective bargaining agreement, but instead represents the arbitrator's own brand of industry justice." *Alco Health Services Corp. v. Teamsters Local 169,* 1992 WL 167282, *3, 1992 U.S.Dist. LEXIS 9663, *8–9 (E.D.Pa.1992). In addition, because courts may not enforce collective bargaining agreements "in a manner that is contrary to public policy," when "an arbitrator construes a collective bargaining agreement in a way that violates public policy, an award based on that construction may be vacated by a court." *Stroehmann,* 969 F.2d at 1441.

The facts pertinent to whether Umpire Summer's decision draws its essence from the 1990 AWA and whether he has construed the collective bargaining agreement in a manner that violates public policy are not contested. In this regard, the parties are in agreement as to such material matters as the contracts in question, the record compiled before the Board, and the evidence considered by Umpire Summers.[4] Thus, the question of whether Umpire Summers' decision should be enforced may appropriately be determined on the basis of the record presented by the parties on their summary judgment motions.

## B. *The Umpire's Decision Does Draw Its Essence From the 1990 AWA*

### 1. *The Loading and Hauling of Culm*

■ Jeddo–Highland contends that the loading and hauling of culm from the Rosa Breaker does not fall within the work jurisdiction provisions of the 1990 AWA because culm, according to Jeddo–Highland, is not coal. In support of this assertion, Jeddo–Highland relies upon the October 14, 1993 report of Steve Montafia, P.E.[5] In his report, Montafia states:

Culm is best defined as waste resulting from the mining, preparation and processing of anthracite coal. The coal production process creates two different materials which are separated and disposed of differently: namely, marketable anthracite coal and a waste material known as culm. The process referred to in the Wage Agreement as the "production, preparation, processing and cleaning of coal" produces coal from raw "run-of-mine" material through the removal of ash from that material until the required specifications of marketable anthracite coal are met. When that pro-

cess is complete, the rejected waste material with its high ash content is called culm. Thus, from a technical standpoint, culm is different from coal in that it has more ash (*i.e.*, rock and other non-coal impurities) than is contained in marketable anthracite coal.... [Docket Entry 41, Ex. "F."]

Mr. Montafia's report was not part of the record before Umpire Summers. Moreover, the question before Umpire Summers was not whether "from a technical standpoint," culm is coal, but rather whether the loading and transportation of culm under the circumstances presented to the Umpire were covered by the 1990 AWA.

Article 2, § (a) of the 1990 AWA requires use of UMW members to produce, prepare, process and clean coal from *refuse banks*. UMW members must also be used for the transportation of coal (other than prepared coal). Moreover, UMW jurisdiction is extended to all "work *customarily related* to all of the above...." (Docket Entry 41, Ex. A at 1; emphasis added.)

Umpire Summers reasoned that because the work activities in question were related to the processing of culm for use as anthracite fuel, the 1990 AWA covered those work activities. In this regard, he noted that the Amended Supply Agreement characterized the material as "anthracite culm," indicating that the material contained anthracite coal. (Docket Entry 27, Ex. "D" at 3–4.) The record before Umpire Summers included testimony that the material in question constituted "run-of-the-mine coal." (Docket Entry 41, Ex. "G" at 18.) As in the case of "run-of-the-mine" coal, the culm in question had been run through the Rosa Breaker. (*Id.* at 28.) A witness for Jeddo–Highland conceded that the refuse bank in question contained coal. (*Id.* at 49). Also before Umpire Summers

---

4. As noted above, the December 10, 1992 proceedings before Umpire Summers were not transcribed. The 1990 AWA did not require that a verbatim record of proceedings before the Umpire be made. Umpire Summers testified at his deposition that it is his practice to have a hearing transcribed if requested by either party and that neither party made such a request in this instance. (Docket Entry 42 at 23.) It should also be noted that the 1990 AWA provides that "[n]either the grievant nor the Employer will be represented by an attorney licensed to practice law in

any jurisdiction in any of the steps of the grievance procedure." (Docket Entry 41, Ex. "A" at 59.)

5. The resume for Mr. Montafia indicates that he was employed by Applied Energy Consultants Corp., which apparently "specializes in providing solid fuel related consulting services to clients in the Co-generation industry, the coal industry and coal consuming industries." (Docket Entry 41, Ex. "F.")

was the record of the proceedings in the Schuylkill County Action. Testimony in that case indicated that the Amended Supply Agreement provided for the "processing, removing, loading and transporting off-site ... [of] the anthracite culm," which was to be used as fuel. (Docket Entry 41, Ex. "H" at 4, 5 and 9.)

In essence, Umpire Summers held that the material in question should be treated as coal because it was being used as a fuel.[6] Clearly, Umpire Summers' treatment of the issue reflects an arguable construction or application of the contract. *See News America Publications,* 918 F.2d at 24.

Jeddo–Highland maintains, however, that Umpire Summers' decision conflicts with case law from this Circuit, citing *Huge v. Ondesko,* 415 F.Supp. 816 (W.D.Pa.1976). *See also Galgay v. Gil–Pre Corp.,* 864 F.2d 1018 (3rd Cir.1988); *Thomas v. Blue Coal Corp.,* 355 F.Supp. 510 (M.D.Pa.1973). Those cases are patently distinguishable. They did not deal with the question of whether handling of culm falls within the work jurisdiction provisions of a collective bargaining agreement. Instead, they address the question of whether pension royalties based upon coal tonnage were payable with respect to the handling of culm. The dispositive issue in each of those cases was whether the activities of the defendant sought to be charged with royalty responsibility constituted the *production* of coal *for use or for sale.* Thus, for example, in *Thomas,* the Honorable Malcolm Muir of this Court ruled that coal was produced for use or for sale *when culm was first processed* through a breaker and made marketable or useable as a fuel. 355 F.Supp. at 512. *Accord, Galgay,* 864 F.2d at 1021. *Thomas* thus acknowledges that culm contains combustible coal. Indeed, in *Huge,* the court relied on the work jurisdiction provisions of the bituminous coal wage agreement in holding that the defendant should be held liable for pension royalties on coal recoverable from a culm bank. 415 F.Supp. at

820. Moreover, none of the cases cited above involved review of a labor arbitration award. Clearly, these cases do not preclude a determination that the culm in question falls within the work jurisdiction provisions of the 1990 AWA.

Jeddo–Highland contends that even if the work activity in question involved coal, it did not constitute the "production, preparation, processing, ... cleaning, [or] transportation of coal." (Article 41, Ex. "A" at 1.) In this regard, Jeddo–Highland referred to Mr. Montafia's report, in which he asserted that "the culm is being transported to and eventually fed into a co-generation facility without any production, processing, cleaning or preparation, because the Wheelabrator facility does not itself extract coal from the refuse material, nor does it require that coal first be extracted from it." (Docket Entry 41, Ex. "F" at 1.)

While there may be no "extraction" of coal from the culm itself, the record before Umpire Summers indicated that the culm in question was sized and crushed, the type of processing of coal performed in a breaker. (Docket Entry 41, Ex. "G" at 19–20.) Testimony was also presented that this type of work was customarily performed by UMW members. (*Id.* at 14, 19–20.) Thus, the loading and transportation of culm could certainly be viewed as "work customarily related to" the "production, preparation, processing and cleaning of coal from ... refuse banks."

In this regard, Umpire Summers' decision in this case is consistent with his ruling in Grievance No. 8298, concerning activities on "coal lands" where a co-generation facility had been constructed. In that matter, Umpire Summers held that the loading and hauling of culm for use in a co-generation facility was within the work jurisdiction provisions of the 1990 AWA. (*See* Exhibit 3F to Umpire Summers deposition.) The fact that the co-

---

**6.** Consistent with this reasoning, Umpire Summers had previously held in Grievance No. 89011 that processing of culm for its rock content pursuant to a lease did not fall within the work jurisdiction provisions of the 1990 AWA.

(*See* Docket Entry 41, Ex. "G" at 80.) As Umpire Summers explained in that ruling, "if coal land is leased out for activities unrelated to coal mining, those activities are not covered." (*Id.* at 81.)

generation facility in this case is not located on the same parcel of property as is the culm bank should not alter the result.[7]

Umpire Summers also concluded that the hauling of culm fell within the 1990 AWA "because Article 2 includes in the jurisdiction of the Agreement, the 'transportation of coal (except transportation of prepared coal)'." (Docket Entry 27, Ex. "D" at 5.)[8] Umpire Summers explained that "if coal, which had been dug and stacked at the mine site were 'dedicated' to a non-signatory, the loading and hauling would have to be done by Miners covered by the 'Wage Agreement.'" (Docket Entry 27, Ex. "D" at 5.) In this regard, Umpire Summers had ruled in Grievance No. 8261 that the hauling of "run-of-the-mine" coal is union work. (Docket Entry 41, Ex. "G" at 70–71.) Because the culm in question was being hauled for its fuel content, it could be viewed as analytically indistinguishable from "run-of-the-mine" coal under the 1990 AWA.

It is thus evident that Umpire Summers, in concluding that the work activity in question fell within the 1990 AWA, "arguably construed or applied the contract." *News America Publications*, 918 F.2d at 24. Clearly, it cannot be said that there is "absolutely no support at all in the record justifying the arbitrator's determinations." *Id.*

7. The fact that Umpire Summers has issued decisions in analogous contexts reinforces the need to restrict judicial review of labor arbitration awards. As explained in *Racho Trucking Co., supra*, 897 F.2d at 1254:

> A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts, which control such private contracts. It is a *generalized code to cover a myriad of cases which the draftsman cannot wholly anticipate.* The collective bargaining agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant. [Emphasis added.]

The parties to this case have bargained to have a single arbiter determine the common law of employment relationships in the anthracite coal fields. At the time he rendered his decision in this matter, Umpire Summers had been the sole arbiter under the anthracite wage agreements for more than fifteen years. Clearly, it is *his* exper-

## 2. Morea's Relationship to Jeddo–Highland

Jeddo–Highland maintains that the 1990 AWA is nonetheless inapplicable here because neither Morea, the owner of the culm, nor Wheelabrator, to whom the culm had been "dedicated," is a signatory to that agreement. Umpire Summers concluded that the work activity in question was indeed subject to the 1990 AWA in light of Section (g) of Article 2 of that agreement, which, in pertinent part, provides:

> The Operators agree that this Agreement covers the operation of all of the coal lands *owned .. by them,* or any of them, *or by any subsidiary or affiliate* at the date of this Agreement or acquired during its term, which may hereafter (during the term of this Agreement) be put into production. [Docket Entry 41, Ex. "A" at 3; emphasis added.]

Jeddo–Highland contends that Umpire Summers could not apply the 1990 AWA without untangling the corporate structure of Jeddo–Highland in order to determine its relationship, if any, to Morea. Jeddo–Highland makes repeated reference to the fact that under the Amended Supply Agreement Morea pledged its stock to Wheelabrator as security for Morea's obligations. Jeddo–Highland also makes repeated reference to the fact that Umpire Summers acknowledged

tise the parties have bargained for to resolve disputes arising under the collective bargaining agreement with consistency, and a district court should therefore be extremely reluctant to second-guess Umpire Summers' interpretation of the parties' agreement.

8. Jeddo–Highland argues that assuming, *arguendo*, culm constitutes "coal", "then culm should be considered 'prepared' coal and therefore specifically exempt from coverage under Article 2 [of the 1990 AWA]." (Docket Entry 40 at 24 n. 2.) This argument is premised on the assertion in Montafia's report that no additional processing of the culm is necessary in order for it to be used. Montafia's assertion, however, was contradicted by Wheelabrator witnesses who testified in the Schuylkill County Action. Specifically, an officer of Wheelabrator testified that the culm must be crushed, sized and blended with other material in order to be used. (Docket Entry 41, Ex. "H" at 36.) Thus, Umpire Summers could conclude that culm was not "prepared coal."

that Morea was "under the control" of Wheelabrator. (*See* Docket Entry 27, Ex. "D" at 2.)

Jeddo–Highland, however, ignores the ample evidence in the record establishing that Morea is an "affiliate" of Jeddo–Highland. For example, David Swisher, in-house counsel of Pagnotti, testified before the Board that "Morea Cogen is a wholly-owned subsidiary of Pagnotti Enterprises." (Docket Entry 41, Ex. "G" at 37.) In the Schuylkill County Action, Atty. Swisher testified that Morea and Jeddo–Highland are "sister companies" which are "affiliated with Pagnotti Enterprises." (Docket Entry 41, Ex. "H" at 52–53.) Schedule X–1 to the Amended Supply Agreement indicates that Morea is part of the "Pagnotti Group." (*See* Ex. 3V to the Summers' deposition.) In light of this evidence, it is unsurprising that the Umpire believed it was unnecessary to untangle Jeddo–Highland's corporate lineage. Jeddo–Highland and Morea are clearly affiliates and land owned by Morea thus falls within the scope of the 1990 AWA. Once again, it cannot be said that there is "absolutely no support at all in the record justifying" Umpire Summers' determination that this matter involves "coal lands" within the jurisdiction of the 1990 AWA.[9]

### 3. *The Wheelabrator/Morea Transaction*

■ When this matter was before Umpire Summers, Jeddo–Highland argued that the Wheelabrator transaction was not a "lease," but instead was a "dedication" of culm. Umpire Summers, observing that Atty. Swisher had acknowledged that the effect of the Amended Supply Agreement "was indistinguishable from that of a lease," concluded that "[t]he creative use of words cannot change the substantive nature of the transaction." (Docket Entry 27, Ex. "D" at 5.)

Seizing on Umpire Summers' conclusion that the Wheelabrator transaction was "in all

substantial respects, a lease of the culm bank with the right to remove the culm," (*id.*), Jeddo–Highland argues that only a lease which was entered into with the subjective intent of avoiding application of the 1990 AWA would fall within the coverage of that collective bargaining agreement. This argument is premised on the following sentence in Article 2, Section (g) of the 1990 AWA:

> The Operators agree that they will not lease out any coal lands for the purpose of avoiding the application of this Agreement. [Docket Entry 41, Ex. "A" at 3.]

Jeddo–Highland asserts that the 1990 AWA distinguishes between leases entered into for the purpose of avoiding the application of the agreement and those leases that were not entered into for such an improper purpose. Because the Amended Supply Agreement was entered into for the purpose of assuring a long-term energy source for Wheelabrator's co-generation facility, Jeddo–Highland argues that the loading and transportation of culm from the Rosa Breaker falls outside the scope of the 1990 AWA.

The fact that the 1990 AWA includes the signatory operators' affirmative promise not to engage in transactions to circumvent the agreement does not necessarily mean that a lease motivated by other considerations removes the property in question from the scope of the agreement. In this regard, the 1990 AWA expressly covers *the operation of all of the coal lands owned by signatories or their affiliates.* Since the property in question is owned by an affiliate of Jeddo–Highland, Umpire Summers could rationally conclude that it remains subject to the 1990 AWA notwithstanding *any* lease.

Moreover, Jeddo–Highland's argument focuses on one sentence without considering the entire agreement. Section (a) of Article 2 of the 1990 AWA expressly provides that "[c]ontracting, subcontracting, *leasing* and

---

**9.** Jeddo–Highland complains that to require UMW members to perform the contested work would violate "Wheelabrator's right to hire whomever it pleases to do this work ... and effectively infringes on its and Jeddo's freedom of association." (Docket Entry 40 at 28.) Jeddo–Highland does not explain the legal foundation for its attempted assertion of Wheelabrator's rights. In any event, it is the freely negotiated

collective bargaining agreement that extends to *activities* occurring on certain property that restrains parties' choices. As a signatory to the 1990 AWA, Jeddo–Highland has committed its affiliate, Morea, to those restraints and, as explained *infra*, Morea cannot circumvent those restraints by "dedicating" the culm located on property that is covered by the 1990 AWA.

subleasing ... will be conducted in accordance with the provisions of this Article." Umpire Summers found that "[t]he 'dedication' of the culm bank here is in all substantial respects a 'leasing' as that term is intended in the Wage Agreement." (Docket Entry 27, Ex. "D" at 5.) He noted that the history of the agreement revealed that "[s]ignatories to the Agreement were not to avoid the Agreement by leasing, contracting or any other form of transfer which allowed non-signatories to do work within the jurisdiction of the Agreement." (*Id.*) It is thus evident that there is ample support for his ruling on this issue.

■ "[T]he parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract." *News America Publications,* 918 F.2d at 25. A difference in interpretation is not a proper basis on which to overturn a labor arbitration award. *See N.F. & M. Corp. v. United Steelworkers of America,* 524 F.2d 756, 759 (3rd Cir.1975). Umpire Summers' conclusion that the transaction in question did not remove it from the purview of the 1990 AWA is premised on an arguable construction of the contract. Accordingly, even if I was convinced that Umpire Summers had committed a serious interpretation error (which I am not), his award must be sustained. *Id.* at 24.[10]

## C. *The Umpire's Decision Does Not Conflict With The Schuylkill County Action*

■ On November 9, 1992, the Honorable D. Michael Stine of the Court of Common Pleas of Schuylkill County issued an Order and Decree Nisi enjoining the UMW "from preventing or attempting to prevent by physical obstruction, violence, or threat of violence" Wheelabrator and its employees from gaining access to the culm in question. (Docket Entry 41, Ex. "I.") Jeddo–Highland, asserting that Judge Stine's ruling was based upon a finding that Wheelabrator's removal of culm was not subject to the 1990 AWA, argues that Umpire Summers was obligated to defer to Judge Stine's conclusion.

The unsound premise of Jeddo–Highland's argument is that Judge Stine found that the activities in question were not subject to the 1990 AWA. Indeed, it does not even appear that the 1990 AWA was included as part of the record before Judge Stine. His opinion indicates that the dispositive issue before him was whether certain picketing activity constituted a "seizure" of property. His uncontested finding that the UMW is not the collective bargaining representative for Wheelabrator's employees cannot be viewed as a determination that the activities in question fall outside the scope of the 1990 AWA. Indeed, Wheelabrator argued to Judge Stine that the matter before him did not involve a labor dispute. Wheelabrator further argued that *the UMW was free to pursue its grievance remedies against Jeddo–Highland in connection with the question of whether the work activity was subject to the 1990 AWA.* (Docket Entry 41, Ex. "H" at 63–65.) Under these circumstances, Judge Stine's decision does not implicate either res judicata or collateral estoppel issues insofar as Umpire Summers' ruling is concerned.

## D. *Umpire Summers' Decision Does Not Violate Public Policy*

■ "Courts may only vacate arbitration awards which explicitly conflict with well-defined, dominant public policy"—that is, public policy that "may be ascertained from

10. In support of the argument that the 1990 AWA authorizes removal of coal lands from union jurisdiction so long as the lease was not entered into for that express purpose, Jeddo–Highland relies on the affidavit of James J. Tedesco, Chairman of the Pagnotti Board. Mr. Tedesco refers to a 1939 resolution pertaining to leasing which, although never formally adopted into any of the agreements, purportedly reflects the intent of the parties that signatories could lease coal lands to non-union operators. He also refers to the fact that UMW efforts to provide for "successorship," "meaning that any successor to coal or coal lands covered by the Agreement by sale or lease *must* utilize UMW workers," was rejected by the operators. (Docket Entry 41, Ex. "B" at 6.) Mr. Tedesco's affidavit, of course, was not made part of the record before Umpire Summers. Moreover, although it may support Jeddo–Highland's interpretation of the 1990 AWA, it does not demonstrate that Umpire Summers' decision fails to draw its essence from the 1990 AWA.

law and legal precedent." *Stroehmann Bakeries*, 969 F.2d at 1441. Jeddo–Highland asserts that "[b]y ruling that culm is essentially coal and not waste, and therefore that culm has some inherent value, co-generation facilities will no longer be able to characterize the material as waste and will therefore not be eligible for tax breaks and incentives under [applicable] regulations and state and federal law."

This argument is meritless. First, it is undeniable that Wheelabrator is paying valuable consideration for the culm in question so it therefore has "inherent value" from an economic perspective regardless of Umpire Summer's decision. Second, the fact that Umpire Summers recognizes that culm contains coal, another undeniable fact, does not impact on how applicable regulatory authorities may characterize the material for "tax breaks and incentives." Finally, Umpire Summers' interpretation of a collective bargaining agreement has no necessary application to state and federal programs encouraging co-generation facilities and the removal of culm banks. Accordingly, Jeddo–Highland's public policy challenge to the arbitration award must be rejected.[11]

## CONCLUSION

For all the foregoing reasons, the summary judgment motion of Jeddo–Highland will be denied and the motion for summary judgment of the UMW will be granted.

An appropriate Order is attached.

### *ORDER*

NOW, THIS 15th DAY OF MARCH, 1995, for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. The Motion for Summary Judgment of Jeddo–Highland Coal Company (Docket Entry 29) is **DENIED.**

2. The Motion for Summary Judgment of Defendants, District 2 and Local Union 1443, United Mine Workers (Docket Entry 26) is **GRANTED.**

3. Jeddo–Highland Coal Company is specifically directed to comply with the final and binding arbitration decision of Umpire Summers in Grievance No. *8393.*

4. The Clerk of Court is directed to enter judgment in favor of the Defendants and against the Plaintiff in the above-captioned matter.

5. The Clerk of Court is directed to mark this case closed.

---

11. Jeddo–Highland also noted that Umpire Summers inappropriately discussed the applicability of the 1990 AWA in the context of "outright sales of coal...." (Docket Entry 40 at 24.) It was Jeddo–Highland, however, that interjected the concept of a sale of coal through its characterization of the Wheelabrator transaction as a "dedication" of culm. Thus, it was not inappropriate for Umpire Summers to discuss the consequences of a transaction that involved the "sale" or "lease" of culm inasmuch as the issue before him was whether activities occurring on "coal lands" owned by a signatory or its affiliate fell within the 1990 AWA notwithstanding a "dedication," (*i.e.,* sale) or "lease" of the culm located on the "coal lands." There was, however, no occasion for the Umpire to address the impact of the sale of the land itself, and I do not believe his decision can be read as extending to that type of a transaction.